IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:23-cv-298

| | |
|---|---|
| DANIEL HAGGERTY,<br><br>   Plaintiff,<br><br>v.<br><br>BNI GLOBAL, LLC & PROSPERITY BRANDS, LLC f/k/a BNI ULTIMATE HOLDINGS, LLC,<br><br>   Defendants. | **COMPLAINT**<br><br>**[JURY TRIAL DEMANDED]** |

Plaintiff Daniel Haggerty, complaining of Defendants BNI Global, LLC and Prosperity Brands, LLC f/k/a BNI Ultimate Holdings, LLC (hereinafter jointly, "Defendants"), alleges and says as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Daniel Haggerty (hereinafter "Plaintiff" or "Haggerty") is an adult citizen and a resident of York County, South Carolina.

2. Upon information and belief, Defendant BNI Global, LLC (hereinafter "BNI Global") is a Delaware limited liability company that maintains a principal place of business in Mecklenburg County, North Carolina.

3. Upon information and belief, Defendant Prosperity Brands, LLC f/k/a BNI Ultimate Holdings, LLC (hereinafter "Prosperity") is a Delaware limited liability company that maintains a principal place of business in Mecklenburg County, North Carolina.

4. This Court has personal jurisdiction over Defendants because they maintain principal places of business, and conduct substantial business, in this District.

5. Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Plaintiff's federal claims arising under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e, *et seq.* (hereinafter "Title VII").

6. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental subject matter jurisdiction over Plaintiff's state claims because they are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

1

7. Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the Western District of North Carolina.

**FACTUAL ALLEGATIONS**

I. <u>Plaintiff's Employment And Improper Termination Therefrom.</u>

8. BNI Global owns and operates various business networking outlets. Through BNI Global's subsidiary, BNI Franchising, LLC, it also franchises locally-owned BNI business networking outlets.

9. Upon information and belief, Prosperity is BNI Global's parent company.

10. After being a member of the BNI community, Plaintiff became employed by BNI Global in or around October 2017 as the Regional Director of the Charlotte organization. In that role, Plaintiff reported directly to BNI Global's Chief Executive Officer, Graham Weihmiller, until a Chief Operating Officer was hired in or around May 2019.

11. Plaintiff was an at-will employee of BNI Global.

12. Thereafter, Plaintiff quickly ascended within BNI Global. For example, in or around August 2018, BNI Global promoted Plaintiff to President of Company Owned Regions.

13. In or around December 2019, BNI Global again promoted Plaintiff to take on Global Company-Owned Region responsibility. Contemporaneously with that promotion, Plaintiff's manager, BNI Global's COO, submitted a performance review giving Plaintiff a 4/5 rating and noted Plaintiff's strong leadership abilities.

14. In or around January 2021, Plaintiff was promoted to President of BNI USA. In that role, Plaintiff was responsible for both all BNI Global-owned outlets and all franchised outlets.

15. Plaintiff received an increase in both salary and bonus compensation with each of the aforementioned promotions.

16. During Plaintiff's employment with BNI Global, he maintained a great reputation both within and outside BNI Global. He also had an exemplary record of performance, as evidenced by his frequent promotions, as well as by various personnel reviews.

17. Shortly after Plaintiff's promotion to President of BNI USA, the COO resigned, at which time Plaintiff again reported to the CEO, Mr. Weihmiller.

18. One of the first projects that Plaintiff was tasked with as President of BNI USA included restructuring several of the company-owned outlets to focus on sales, rather than support. Plaintiff and his team designed a reorganization plan, received approval from Human Resources, and developed a communications timeline. Plaintiff presented the plan to Mr. Weihmiller in or

2

around May 2021, with anticipated implementation to begin in or around June 2021. However, Mr. Weihmiller asked Plaintiff to hold off until a new COO onboarded to evaluate the plan.

19. In or around June 2021, BNI Global hired a new COO, Zack Kollias. Plaintiff and Mr. Kollias worked together closely on the reorganization plan, and presented the same to Mr. Weihmiller on or around July 14, 2021. Mr. Weihmiller indicated he was pleased with the progress, but requested further work.

20. That evening, Plaintiff and Mr. Kollias went to dinner to discuss the next steps. A female colleague who reported directly to Plaintiff also attended that dinner.

21. During dinner, Mr. Kollias stated: "Eventually, you two (referring to the female colleague and Plaintiff) will be on stage at the U.S. conference receiving a standing ovation for your efforts! Of course, Dan, I'm assuming that the audience would much rather see [female colleague] on stage, right?" Plaintiff's female colleague expressed that this made her uncomfortable, but requested that Plaintiff not bring it up.

22. On or around August 11, 2021, Plaintiff began a two-day offsite with three of his direct reports, all of whom are female. During that meeting, Mr. Kollias again engaged in crude comments towards Plaintiff's female colleagues. For example, Mr. Kollias commented on one female's tanned skin and made light of another female's pregnancy.

23. Upon information and belief, Mr. Kollias also engaged in harassing comments and behavior towards other female employees, too, and Mr. Weihmiller and others were aware of such conduct and other complaints related thereto.

24. While on the offsite meeting, Plaintiff also received his performance review from Mr. Kollias. In that review, Plaintiff received a 2/5, but Mr. Kollias also stated Plaintiff had until the end of the year (2021) to turn around the numbers. The written report concluded with a comment form Mr. Weihmiller, which read, "I know you can do this!"—thereby indicating BNI Global's faith and belief in Plaintiff's abilities to perform and right the ship.

25. The review and comments were also consistent with the expectations for the position, as it was well-known that the position was difficult and that it would take time to turn around and grow the company.

26. On or about August 16, 2021, Plaintiff met with his three female colleagues regarding Mr. Kollias' inappropriate behavior and comments, at which time they requested Plaintiff escalate the situation to HR. Thereafter, on or about August 19, 2021, Plaintiff scheduled a meeting with the Vice President of HR, which was rescheduled to August 25, 2021, due to miscommunication regarding scheduling.

27. On or about August 20, 2021, Plaintiff received a call from one of his female colleagues, who indicated Mr. Weihmiller's assistant called her regarding Mr. Kollias' inappropriate comments. Mr. Weihmiller's assistant confirmed that, on at least two prior

occasions, Mr. Kollias' behavior and comments were escalated to Mr. Weihmiller, who attempted to "coach" Mr. Kollias on this behavior.

28. Plaintiff's colleague confirmed to Mr. Weihmiller's assistant that Mr. Kollias engaged in inappropriate comments to her and other females, and further advised that she asked Plaintiff to relay Mr. Kollias' comments to upper management.

29. After Plaintiff's phone call with the female colleague, Plaintiff messaged Mr. Weihmiller and asked that Mr. Weihmiller call Plaintiff regarding this matter. After receiving no response, Plaintiff again messaged Mr. Weihmiller on or about August 21, 2021. Again, Mr. Weihmiller failed to respond.

30. On or about August 22, 2021, Plaintiff received a call from Mr. Weihmiller's assistant. During this call, Plaintiff expressed all of the concerns from the females on his team. Mr. Weihmiller's assistant emailed Plaintiff that night, informing him that she would reach out to Plaintiff's female team members personally.

31. Plaintiff relayed that information to his female colleagues on or about August 23, 2021. However, Mr. Weihmiller's assistant only reached out to one woman, and simply requested a "high-level summary" of Mr. Kollias' behavior and comments.

32. During that same time period, Plaintiff had to continue working with Mr. Kollias to prepare for the reorganization plan presentation to the Board of Directors, which was scheduled to occur on September 9, 2021.

33. On or around August 24, 2021, Plaintiff gave a scheduled preview of the presentation to Mr. Weihmiller, his assistant, the Chief Financial Officer (Anna Reynolds), and the Chief Development Officer. That preview presentation was scheduled for ninety (90) minutes. However, Plaintiff stopped presenting after approximately thirty (30) minutes, during which time Mr. Weihmiller did not pay attention and asked patronizing, rhetorical questions to prove that Plaintiff had not transitioned the organization to a sales team.

34. On or about August 25, 2021, Plaintiff received an email from Mr. Weihmiller at 5:00 a.m. requesting documentation on Plaintiff's routines, organization charts, strategic plans, and the like.

35. Later that same morning, Ms. Reynolds emailed the three women on Plaintiff's team, stating that BNI Global had "taken appropriate action and will take additional action if warranted." Plaintiff learned about that communication from his female colleagues, who expressed their dissatisfaction with BNI Global's response.

36. At 11:00 a.m. that day, Plaintiff met with BNI Global's Vice President of HR (Michael Gamble) for the aforementioned meeting that was rescheduled from August 19, 2021. Mr. Gamble was disappointed in BNI Global's handling of this matter, was amazed he had not been brought into the loop sooner, and indicated he would discuss the situation with Ms. Reynolds

the next day. Subsequently, Mr. Gamble resigned from his employment with BNI Global, at least in part due to BNI Global's handling of this situation.

37. Then, at 12:00 p.m., Plaintiff received a notification that he would be meeting with Mr. Weihmiller and Ms. Reynolds at 1:45 p.m. During that meeting, Mr. Weihmiller terminated Plaintiff's employment. Mr. Weihmiller's stated reason for the termination was purportedly so that he could "take USA leadership in a different direction." Plaintiff reminded Mr. Weihmiller and Ms. Reynolds of his exemplary performance and also explained his concern for his team regarding Mr. Kollias' inappropriate comments and behavior.

38. On or about August 27, 2021—two days after Plaintiff's termination—Mr. Weihmiller delivered flowers to Plaintiff, thanking Plaintiff for his notable contributions to BNI Global. On or about August 30, 2021, Mr. Kollias sent a text message to Plaintiff expressing his disappointment in BNI Global's termination of Plaintiff, and noting that "we [Mr Kollias and Plaintiff] were not afforded that time" to turn the business around. Both of these events are inconsistent with BNI Global's stated reason for Plaintiff's termination.

39. In reality, BNI Global terminated Plaintiff's employment wrongly and in retaliation for Plaintiff's reporting and opposing of Mr. Kollias' harassing behavior and comments to Plaintiff's female colleagues.

II. Plaintiff's EEOC Charge of Discrimination

40. On February 9, 2022, Plaintiff filed a Charge of Discrimination against BNI Global with the United States Equal Employment Opportunity Commission ("EEOC"), Charge No.: 430-2022-01029. On February 10, 2022, Plaintiff filed an Amended Charge of Discrimination (the Charge of Discrimination and Amended Charge of Discrimination are hereinafter jointly referred to as the "Charge of Discrimination").

41. Thereafter, the EEOC began its investigation. BNI Global also submitted its Position Statement to the EEOC on April 4, 2022, and Plaintiff submitted his written response thereto on June 9, 2022.

42. On September 30, 2022, the EEOC issued its Determination on the merits of Plaintiff's Charge of Discrimination (the "Determination"). A true and accurate copy of the Determination is attached hereto as Exhibit 1. In pertinent part, the EEOC stated therein as follows:

> Charging Party alleges Respondent violated Title VII when it discharged him in retaliation for engaging in protected activity under the statute. Respondent denies the allegations.
>
> The evidence obtained during the Commission's investigation supports Charging Party's allegations and does not support Respondent's defense. The evidence shows that in or around October 2017, Respondent hired Charging Party as a Regional Director then promoted to President in or

around January 2021. In or around August 2021, Charging Party engaged in protected activity under Title VII when he opposed conduct that Charging Party reasonably and in good faith believed to be an unlawful employment practice. Within days Respondent terminated Charging Party's employment under circumstances that give rise to an inference of discrimination. Evidence obtained during investigation shows a causal connection between Charging Party's protected activity and his discharge. Thus, the evidence shows Charging Party was discharged in retaliation for engaging in a protected activity. Based on the above, there is reasonable cause to believe that a violation of the statute has occurred.

43. In the Determination, the EEOC also invited the parties to participate in the EEOC's conciliation process in an effort to resolve BNI's violations of Title VII. The parties participated in such process, were unable to reach a resolution, and the EEOC issued a letter stating that: "The Commission has determined that efforts to conciliate this charge as required Title VII of the Civil Rights Act of 1964 (Title VII) have been unsuccessful."

44. On February 17, 2023, the EEOC Issued its Conciliation Failure and Notice of Rights. Therein, the EEOC reiterated its determination that it "found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with [BNI Global] that would provide relief for [Plaintiff]." The Conciliation Failure and Notice of Rights also provided Plaintiff with official notice of his right to sue. A true and accurate copy of the Conciliation Failure and Notice of Rights is attached hereto as Exhibit 2.

III. Defendants' Improper Lawsuit Against Plaintiff And Attempts To Void Plaintiff's Equity.

45. In connection with Plaintiff's employment with BNI Global, he executed a Restrictive Covenant agreement.

46. Prosperity—BNI Global's parent company—maintains an Equity Incentive Plan whereby it awards ownership interests, or "Plan Units," to certain of its (and its subsidiaries, including BNI Global) employees.

47. On or about September 23, 2019, Prosperity sent Plaintiff an Award Letter, whereby Plaintiff received certain Plan Units pursuant to the Equity Incentive Plan.

48. On December 21, 2021—four months after BNI Global improperly terminated Plaintiff's employment—BNI Global and Prosperity initiated litigation against Plaintiff in this Court, Case No.: 3:21-cv-677.

49. Therein, Defendants asserted that Plaintiff, *inter alia*, breached the Restrictive Covenant agreement and the Terms and Conditions attached to the Award Letter. Defendants also sought a Declaratory Judgment that Plaintiff's alleged breaches gave Prosperity the option to purchase Plaintiff's vested Plan Units for $1.00. Defendants further asserted that Plaintiff allegedly misappropriated BNI Global's purported trade secrets and confidential information.

50. As stated in Defendants' Complaint in 3:21-cv-677, their allegations—asserted upon information and belief—generally were that: Plaintiff allegedly made disparaging comments about BNI Global and its executives, employees, and franchisees; that Plaintiff did not timely return his BNI Global-issued laptop; and that Plaintiff accessed certain BNI Global information on such laptop following his termination.

51. In Plaintiff's Answer in that litigation, he generally denied that he acted improperly, denied that Defendants' claims are meritorious, and denied that Defendants are entitled to any of their requested relief.

52. Upon information and belief, Defendants knew that the alleged conduct did not constitute a breach of contract or statutory violation, and that the lawsuit lacked a reasonable basis in fact or law. Upon further information and belief, Defendants only asserted such inflated allegations as further retaliation for Plaintiff's aforementioned complaints and in an effort to gain leverage over Plaintiff related to those complaints and his wrongful termination.

53. On November 23, 2022, Defendants filed a Voluntary Stipulation of Dismissal Without Prejudice of that lawsuit, that was stipulated to by all parties.

54. While Plaintiff believes that Defendants' prior lawsuit was meritless and simply another example of their improper retaliation against him, the lawsuit does demonstrate that a controversy exists between the parties as to whether Prosperity is entitled to purchase Plaintiff's vested Plan Units for $1.00.

## FIRST CLAIM FOR RELIEF
**[Violations of Title VII of the Civil Rights Act of 1964]**

55. Plaintiff restates and realleges the allegations contained above as if fully set forth herein.

56. Plaintiff is an employee within the meaning of Title VII.

57. BNI Global is an employer within the meaning of Title VII.

58. Upon information and belief, Prosperity is also an employer within the meaning of Title VII.

59. Plaintiff engaged in a protected activity by making complaints regarding the improper harassment and hostile work environment suffered by Plaintiff's female colleagues and direct reports as a result of their sex.

60. That harassment was an unlawful employment practice, or at minimum, Plaintiff reasonably believed such harassment to be unlawful.

61. Defendants took adverse action against Plaintiff, including at least by wrongfully terminating Plaintiff's employment in retaliation for his complaints, by filing a baseless lawsuit against Plaintiff seeking damages and a determination that his vested Plan Units could be purchased for $1.00, and in all other ways to be shown at trial.

62. There is a direct and proximate causal relationship between Plaintiff's protected activity and Defendants' adverse employment activity.

63. That causal relationship is evidenced by, at least, the fact that Defendants knew Plaintiff engaged in a protected activity and Defendants took the aforementioned adverse action shortly thereafter. For example, Mr. Weihmiller knew about Plaintiff's complaints and efforts to stop the harassing conduct and Mr. Weihmiller is the individual who terminated Plaintiff's employment.

64. As a direct and proximate result of Defendants' violations of Title VII, Plaintiff has suffered damages in an amount to be determined at trial.

65. Defendants' discrimination and retaliation was both unlawful and intentional, and Defendants engaged in such conduct with malice or with reckless indifference to Plaintiff's rights, that is, Defendants' conduct was taken in the face of a perceived risk that such actions violated Title VII. As such, Plaintiff is entitled to an award of punitive damages against Defendants.

66. Alternatively and in addition, Defendants' conduct was malicious, intentional, willful, and done with a reckless and wanton disregard for Plaintiff's rights. Plaintiff is therefore entitled to recover punitive damages from Defendants pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*, in an amount to be determined at trial, sufficient to punish Defendants for their wrongful conduct and to deter such conduct in the future by Defendants and others similarly situated.

## **SECOND CLAIM FOR RELIEF**
**[Breach of Contract]**

67. Plaintiff restates and realleges the allegations contained above as if fully set forth herein.

68. Plaintiff and Defendants entered into a valid and enforceable Award Letter and Terms and Conditions.

69. That contract was entered into for good and valuable consideration and the parties mutually assented to the contract terms through offer and acceptance so as to establish a meeting of the minds.

70. Plaintiff fulfilled all of his material obligations under the contract.

71. Defendants breached the contract, or at minimum anticipatorily repudiated their obligations, at least by refusing to honor the obligation to provide Plan Units and by initiating

baseless litigation against Plaintiff in an effort to purchase Plaintiff's vested Plan Units for a mere $1.00.

72. As a direct and proximate result of Defendants' breach, Plaintiff has been damaged in an amount to be determined at trial.

73. Pursuant to the terms of the contract, Plaintiff is also entitled to recover his reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
**[Declaratory Judgment]**

74. Plaintiff restates and realleges the allegations contained above as if fully set forth herein.

75. As set forth above, an actual and justiciable controversy exists as to whether Prosperity is entitled to purchase Plaintiff's vested Plan Units for $1.00.

76. This Court has the power to declare the Parties' respective rights and obligations.

77. Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 USC §§ 2201, *et seq.*, Plaintiff is entitled to a Declaratory Judgment holding that he did not materially breach any applicable agreement between him and either Defendant, and that Prosperity is not entitled to purchase his vested Plan Units for $1.00.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court for the following relief against Defendants:

1. An award for Plaintiff based on Defendants' violations of Title VII in an amount to be determined at trial, plus interest;

2. An award for Plaintiff based on Defendants' breach of contract in an amount to be determined at trial, plus interest;

3. That the Court enter a Declaratory Judgment as enunciated above;

4. That the Court award Plaintiff punitive damages pursuant to Title VII, and alternatively pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*;

5. That the Court award Plaintiff his reasonable attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k), the applicable contract, and all other applicable law;

6. That the Court tax the costs of this action against Defendants;

7. That all issues triable by a jury be so tried; and

8. For all other relief, both legal and equitable, which the Court deems just and proper.

This the 17th day of May, 2023.

**JAMES, McELROY & DIEHL, P.A.**

s/ John R. Buric
John R. Buric, N.C. State Bar No. 22688
John R. Brickley, N.C. State Bar No. 41126
525 N. Tryon Street, Suite 700
Charlotte, North Carolina 28202
Telephone: (704) 372-9870
Facsimile: (704) 333-5508
Email: jburic@jmdlaw.com
jbrickley@jmdlaw.com
*Attorneys for Plaintiff*